Finkelstein v Finkelstein (2018 NY Slip Op 03926)





Finkelstein v Finkelstein


2018 NY Slip Op 03926


Decided on June 5, 2018


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on June 5, 2018

Friedman, J.P., Sweeny, Kahn, Singh, Moulton, JJ.


5820N 309125/13

[*1] Yoram Finkelstein, Plaintiff-Appellant,
v
Bat-El Yishay Finkelstein, Defendant-Respondent.


Eran Regev, Manhasset, for appellant.
Elayne Kesselman, New York, for respondent.



Order, Supreme Court, New York County (Deborah A. Kaplan, J.), entered on or about April 11, 2017, which, to the extent appeal from as limited by the briefs, granted defendant wife's motion to confirm, and denied plaintiff husband's motion to reject, the report of a special referee, dated September 30, 2016, which, after a hearing, awarded the parties' frozen embryo to the wife, unanimously reversed, on the law and the facts, without costs, the wife's motion denied, the husband's motion granted, and the husband awarded the embryo, but only for the purposes of disposal by the New Hope Fertility Center (NHF) in accordance with NHF procedures as set forth in the parties' consent agreement.
The parties were married in Israel in December 2011. They attempted in vitro fertilization (IVF) in Israel without success. After moving to New York in 2012, they engaged the services of NHF in the hope of conceiving a child via implantation of cryopreserved embryos in the wife's uterus. In July 2012 they signed an agreement with NHF entitled "Consent for the Cryopreservation of Human Embryo(s)" (the Consent Agreement). The Consent Agreement provided three options concerning use of frozen embryos created from the parties' genetic donations. The parties selected "Choice A": "consent to the cryopreservation of embryos for our own use."
Paragraph 7 of the Consent Agreement is entitled "Voluntary Participation" and provides "I/We may withdraw my/our consent and discontinue participation at any time . . . ." Paragraph 16, entitled "Authorization," provides, "This consent will remain in effect until such time as I notify NHF in writing of my/our wish to revoke such consent."
After five or six further unsuccessful IVF attempts with NHF, the husband, then 58 years old, filed for divorce and requested sole custody of the one remaining cryopreserved embryo. He also moved to enjoin the wife, then 47 years old, from destroying, using, or preserving the embryo. The husband obtained an ex parte temporary restraining order embodying that relief. However, in an order entered on or about January 23, 2014, Supreme Court found, inter alia, that the husband had not demonstrated a likelihood of success on the merits, as there was nothing in the Consent Agreement that would prevent the wife from going ahead with implantation unilaterally, and issued a preliminary injunction enjoining NHF and the wife from "destroying or transferring the cryopreserved embryo to anyone other than the wife."
On March 5, 2014, the husband executed and had notarized a pre-printed NHF form entitled "Notice of Disposition of Frozen Human Sperm/Testicular Tissue." He checked off the space for "other," and handwrote: "revoking my consent to use of any of my genetic material, including the embryo created with Batel Yishay Finkelstein." On the same date he also signed a notarized statement revoking his consent, which states: "I, Yoram Finkelstein, hereby revoke my consent to any use of any of my genetic material, including the embryo created with Bat-El Yishay Finkelstein, pursuant to the Consent for the Cryopreservation of client Deposit or Sperm/semen, and pursuant to Consent for The Cryopreservation of Human Embryo."
Supreme Court subsequently granted an injunction to preserve the status quo, preventing [*2]any destruction or implantation of the embryo, and referred the question of equitable distribution of the embryo to a special referee to hear and report, along with other issues [FN1]. After a hearing, the special referee issued a report that narrowly read the consent provisions of the Consent Agreement to refer only to the terms and conditions of NHF's storage of cryopreserved embryos, and found that the husband did not have a right to revoke his consent to the wife's use of the embryo. The special referee awarded the embryo to the wife, concluding that the balance of equities favored the wife because this represented her last chance to become a biological parent.
Supreme Court granted the wife's motion to confirm the special referee's report and denied the husband's motion to reject it. We now reverse.
In Kass v Kass (91 NY2d 554 [1998]), the Court of Appeals determined that agreements between donors participating in IVF should be enforced pursuant to general rules of contract interpretation. Here, the special referee's interpretation of the Consent Agreement is contrary to its plain meaning, and the report therefore should not be confirmed (see Kaplan v Einy , 209 AD2d 248, 250-251 [1st Dept 1994]). The Consent Agreement specifies that participation in the procedures involving cryopreservation of embryos is voluntary and that either party may withdraw consent at any time. The Consent Agreement is not limited to cryopreservation or storage of the embryos, but includes the future transfer of cryopreserved embryos to the wife's uterus. The provisions permitting either party to revoke consent are not limited to cryopreservation, but permit either party to withdraw consent to participation in the entire IVF process. Contrary to the finding of Supreme Court, the Consent Agreement does not indicate that the court has plenary authority to determine ownership of the embryo in the event of divorce [FN2]. Additionally, contrary to Supreme Court's finding, the husband's revocation of consent did not violate the automatic orders served pursuant to Domestic Relations Law § 236(B)(2)(b). Rather, the revocation comported with the orders by seeking to maintain the status quo pending equitable distribution of the parties' marital assets, which the parties understood to include the embryo.
Since "the document makes clear the parties' over-all intention" (Kass v Kass , 91 NY2d at 567), we are required to choose the construction that "will carry out the plain purpose and object of the [agreement]" (id. [internal quotation marks omitted]). The husband's broadly worded revocation of consent to the continued use of any of his genetic material, including the embryo created with the wife, definitively revoked his consent to the continuation of the IVF process, including implantation by the wife of the embryo at issue here.
As one party has withdrawn consent, the remaining cryopreserved embryo may not be used for any purpose by either party. The parties also did not agree to the use of the embryo by any other person, at least under the facts that obtain here. Accordingly, the husband, as [*3]prevailing party on this appeal, is awarded the remaining embryo, but only for the purpose of ensuring that NHF disposes of the embryo as provided in the Consent Agreement.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JUNE 5, 2018
CLERK



Footnotes

Footnote 1:Before the commencement of the hearing before the special referee, the parties resolved all issues except ownership of the embryo.

Footnote 2:In coming to this conclusion, Supreme Court relied on a provision in paragraph 12 of the Consent Agreement, which is entitled "Costs." The relevant passage in that section reads: "In the event of divorce, I/we agree together and/or separately to bear any and all costs of storage until disposition is decided by a court of law." That provision is best understood as a means for NHF to know who to bill for storage upon the conclusion of the divorce. The passage does not purport to supercede the consent revocation rights available to the parties in the Consent Agreement.